UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,       :

              vs.          :        Case No.:  25-cr-412 (MMG)

CHANGLI LUO,          :

              Defendant.  :
-------------------------------------------------------x

## <u>DEFENDANT CHANGLI LUO'S NOTICE OF MOTION TO DISMISS THE INDICTMENT AND REQUEST FOR AN ORDER FOR A BILL OF PARTICULARS</u>

PLEASE TAKE NOTICE, that upon the Declaration of Arthur L. Aidala, Esq., the exhibits thereto, and the accompanying Memorandum of Law, defendant Changli Luo will move this Court before the Honorable Margaret M. Garnett, at the United States Courthouse, 500 Pearl Street, Courtroom 705, New York, New York 10007, for an Order dismissing the Indictment or, in the alternative, for a bill of particulars and discovery on this motion.

Dated: February 20, 2026
      New York, New York

                                         /s/
                                  Arthur L. Aidala, Esq.
                                  AIDALA, BERTUNA & KAMINS, P.C.
                                  546 5th Avenue, 6thFloor
                                  New York, New York 10036
                                  E-Mail: aidalaesq@aidalalaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES OF AMERICA,        :

                vs.            :         Case No.:  25-cr-412 (MMG)

CHANGLI LUO,                :

              Defendant.  :
-----------------------------------------------------x


## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS INDICTMENT

Arthur L. Aidala, Esq.
Michael T. Jaccarino, Esq.
Alexandra Jo Debenedictis, Esq.
Aidala, Bertuna & Kamins, P.C.
546 5th Avenue, 6th Floor
New York, New York 10036
aidalaesq@aidalalaw.com

*Attorneys for Changli Luo*

# **TABLE OF CONTENTS**

Preliminary Statement ................................................................................... 1

The Charges & Statement of Relevant Facts .............................................. 2

Legal Standard on a Motion to Dismiss ...................................................... 9

Count One — The Government's Wire Fraud Theory is Insufficient ........... 9

The Wire Fraud Statute is Vague-as-Applied ............................................. 12

Count Two — Extortion: The Requirement of "Wrongfulness" ................. 13

As a Matter of Law, the Conduct Alleged Is Not "Wrongful" .................. 14

The Extortion Statutes Are Vague-as-Applied ........................................... 20

Count Three — Blackmail — Consideration of Not Informing ................. 21

The Indictment Violates Ms. Luo's Rights Under the Fifth
Amendment Due Process Clause ................................................................ 21

The Government Must Provide Particulars ................................................. 26

The Following Particulars are Necessary to the Defense ............................ 32

The Court has the Discretion to Order the Requested Bill of Particulars ... 34

Conclusion .................................................................................................. 34

# TABLE OF AUTHORITIES

**Cases**

*American Family Mut. Ins. Co. v. Zavala,*
   392 F.Supp.2d 1108 (D. Ariz. 2003) ................................................................... 28

*American Family Mut. Ins. Co. v. Zavala,*
   392 F.Supp.2d 1108, 1116 (D. Ariz. 2003) ......................................................... 12

*Bouveng v. NYG Capital, LLC,*
   175 F.Supp.3d 280, 320 (S.D.N.Y. 2016) (Gardephe, J.) (citations omitted) ...... 18

*Gomez v. City of New York,*
   805 F.3d 419 (2d Cir. 2015) ......................................................... 10, 27, 28

*Jones v. Combs,*
   No. 24-cv-1457,2025 U.S. Dist. LEXIS 54277 (S.D.N.Y. Mar. 24, 2025) ...... 6, 27

*United States v. Lewis*
   , 517 F.3d 20, 27 (1st Cir. 2008) ......................................................... 23

*United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir. 1981) ....................... 14

*United States v. Coss,*
   677 F.3d 278, 285 (6th Cir. 2012) ......................................................... 15

*United States v. Enmons,*
   410 U.S. 396 (1973) ......................................................... 24

*United States v. Hoskins,*
   73 F.Supp.3d 154, 166 (D.Conn. 2014) ................................................. 13

*United States v. Pendergraft,*
   297 F.3d 1198, 1205-08 (11th Cir. 2002) ............................................. 24

*Revson v. Cinque & Cinque, P.C.,*
   221 F.3d 71, 80 (2d Cir. 2000) ......................................................... 17

*Susman v. Bank of Israel,*
   56 F.3d 450, 459 (2d Cir. 1995) ......................................................... 17

*United States v. Aleynikov,*
   676 F.3d 71 (2d Cir. 2012) ......................................................... 27

*United States v. Aleynikov,*
   676 F.3d 71, 75-76 (2d Cir. 2012) ......................................................... 9

*United States v. Armstrong,*
   517 U.S. 456, 464 (1996) ......................................................... 21

*United States v. Batchelder,*
   442 U.S. 114, 125 (1979) ......................................................... 21

*United States v. Berrios,*
   501 F.2d 1207, 1211 (2d Cir. 1974) (quoted in Armstrong, 517 U.S. at 468) ...... 22

*United States v. Brunshtein,*
   344 F.3d 91 (2d Cir. 2003) ......................................................... 12, 28

*United States v. Clarke, No. 05-Cr-17 (DAB),*
   2006 WL 3615111 (S.D.N.Y. Dec. 7, 2006) ......................................... 9, 27

*United States v. Enmons,*
   410 U.S. 396, 411 (1973) ......................................................... 19

*United States v. Hastings,*
   126 F.3d 310, 315 (4th Cir. 1997) ......................................................... 23

*United States v. Hoskins,*
   73 F.Supp.3d 154 (D.Conn. 2014) ......................................................... 31

*United States v. Jackson,*
   180 F.3d 55, 67-71 (2d Cir. 1999) ......................................................... 14, 15

*United States v. Kozminski,*

487 U.S. 931, 952 (1988) ............................................................................................ 19

*United States v. Milani,*
739 F.Supp. 216 (S.D.N.Y. 1990) ............................................................................. 32

*United States v. Milani,*
739 F.Supp. 216, 218 (S.D.N.Y. 1990) ..................................................................... 13

*United States v. Pendergraft,*
297 F.3d 1198, 1206 (11th Cir. 2002) ...................................................................... 15

*United States v. Rahman,*
189 F.3d 88, 116 (2d Cir. 1999) ......................................................................... 12, 20

*United States v. Sattar,*
272 F.Supp.2d 348 (S.D.N.Y. 2003) ................................................................... 13, 28

*United States v. Stewart,*
590 F.3d 93, 121 (2d Cir 2009) ................................................................................ 22

*United States v. Strauss,*
999 F.2d 692 (2d Cir. 1993) ............................................................................... 12, 29

*United States v. Albertson,*
971 F.Supp. 837, 842-43 (D.Del. 1997) ................................................................... 14

*Vermande v. Hyundai Motor America, Inc.,*
352 F.Supp.2d 195, 203 (D. Conn. 2004) ........................................................... 11, 19

*Zunzurovski v. Fisher,*
No. 23-cv-10881, 2024 U.S. Dist. LEXIS 62568 (S.D.N.Y. Apr. 3, 2024) ....................... 6, 26

**Statutes**

18 U.S.C. §1343 ................................................................................................ 2, 9, 26, 27

18 U.S.C. §1951 .................................................................................................. 2, 13, 14, 25

18 U.S.C. §873 ............................................................................................................. 2, 26

18 U.S.C. §875 ............................................................................................................. 2, 24

Section 875 ............................................................................................ 13, 14, 16, 18, 34

Rule 12 of the Federal Rules of Criminal Procedure ............................................................ 1, 24

Defendant Changli Luo, through counsel, and pursuant to Rule 12(b)(3)(B)(V) of the Federal Rules of Criminal Procedure and the Due Process Clause of the Fifth Amendment, respectfully submits this Memorandum of Law in support of her Motion to Dismiss Counts One, Two, and Three of the Indictment.

## PRELIMINARY STATEMENT

This case involves a woman who was harmed, both during and after a sexual encounter with a married billionaire, businessman, and financial investor. The woman is being prosecuted for statements made by her and her attorney during agreed-upon mediation and settlement discussions in which she allegedly threatened to expose the billionaire's misconduct unless the billionaire settled claims that had a direct nexus to the conduct which harmed her. These negotiations surrounded the appropriate amount of money that the woman had a direct claim of right to, as compensation for the incurable sexually transmitted disease that the billionaire transmitted to her during an inappropriate and aggressive sexual encounter.

Following an initial settlement agreement, obtained through a mediator, the woman discovered that the billionaire had transmitted to her an incurable sexually transmitted disease, after which she retained the services of a now-disgraced attorney who, unbeknownst to her, had a troubling history of unethical conduct, reckless tactics, and an ignorance of the law, putting his clients at risk with his aggressive pursuit of settlements. The primary basis for the instant charges stem from the reckless statements made by that lawyer who, inexplicably, has not been charged in this matter.

The Indictment should be dismissed in its entirety for two interrelated reasons.   First, the Indictment fails to state an offense because the conduct, as alleged in Counts One through Three, is not "wrongful" under either 18 U.S.C. §875(d) or 18 U.S.C. §1951; instead, it describes conduct that is carved out from prosecution by prevailing extortion jurisprudence and protected by the First Amendment.  Indeed, the charged statutes are vague as applied to Ms. Luo because they do not provide sufficient notice to a plaintiff that he/she may be prosecuted for 'threats' made by a retained lawyer during settlement negotiations to truthfully expose misconduct directly related to the client's claims for legal and equitable relief.  In addition, the Government selectively chose to prosecute the defendant, and not her attorney, who is the one primarily responsible for the statements made during settlement negotiations.   In addition, the defendant did not make "false statements," and she was "entitled" to the money demanded as a result of the harm that the billionaire caused her.

## The Charges & Statement of Relevant Facts

The Indictment charges Ms. Luo with: Wire Fraud under 18 U.S.C. §1343 (Count One), Hobbs Act Extortion, 18 U.S.C. §1951 (Count Two), Blackmail, 18 U.S.C. §873 (Count Three), and Destruction of Records, under §1519 (Count Four).  The essence of the charges is that Ms. Luo, through a mediator and later through an attorney, engaged in a scheme to allegedly extort and blackmail Victim-1, by making false statements to him and threatening to report his wrongdoing, unless Victim-1 agreed to make certain monetary payments to the defendant.

Near the end of 2022, after several romantic meetings and the courting of the

defendant by Victim-1, the defendant and Victim-1 had sexual intercourse at the defendant's residence.

In November of 2023, after Victim-1 learned that the defendant communicated details of their relationship and sexual encounter to a romantic partner of Victim-1, Victim-1 sent the defendant a message, in which he confronted the defendant for sharing their private encounter. Victim-1 stated, in part, that he had contacted his attorneys and was prepared to go to court to prevent further "harassment." Victim-1 also stated that he would "contact immigration authorities." This threat to "contact immigration authorities" was likely a reference to the defendant's Chinese descent and, thus, Victim-1's perception of the defendant's immigration status, and that he would be able to leverage his power and influence to get her deported. USAO_0002983.

In May of 2024, the defendant sent Victim-1 a letter, written in part as a response to the allegations made by Victim-1 and his threat that he would use his wealth and power to get her deported. In the letter, the defendant detailed the pain and suffering that Victim-1 had caused her, as a result of the manner and circumstances under which they engaged in intercourse. The defendant's letter to Victim-1 contained no threats.[1] Instead, the defendant expressed her desire to "pursue justice for herself." USAO_00002999. The defendant, as she is permitted to do, detailed Victim-1's misconduct and the various venues available for the defendant to obtain the justice to which she believed she was entitled.

Almost immediately, Victim-1 suggested and agreed to enter mediation, in which it was agreed that all communications made during the mediation would be treated as

---

[1] The Government mentions that, in the defendant's letter, she stated that her "home has cameras," and that "everything [victim] did was caught on camera." However, later, during settlement negotiation, the defendant's attorney stated that he personally observed the videos. USAO_0002971.

"privileged settlement discussions." USAO_0002521. During the settlement discussions, Victim-1 was represented by high-powered international law firm Skadden, Arps, Slate, Meagher & Flom, LLP. The defendant had no attorney. Eventually, a settlement agreement was reached, in which Victim-1 agreed to pay the defendant the substantial sum of $6.5 million over several years, $1 million of which was paid upon the signing of the agreement. USAO_0002553.

Shortly thereafter, the defendant discovered that Victim-1 had infected her with a sexually transmitted disease: HPV-16, a high-risk strain of human papilloma virus. HPV-16 is widely known to cause pelvic pain and discomfort, result in many issues related to childbirth complications, and is the cause of the majority of cervical cancers, among other cancers. There is no cure. Devastated, shocked, and scared, the defendant sought to re-negotiate the settlement agreement based on this new information that was unknown to her at the time she signed the initial agreement. Victim-1 did not deny responsibility for the transmission of the sexually transmitted disease. Instead, Victim-1 recommended continued mediation. To be clear, there has been no allegation that publicly exposing Victim-1's misconduct and/or his transmission of HPV-16 to the defendant was a threat to expose false information, or that potential legal action for making such a claim would have been frivolous or meritless. Instead, Victim-1's actions suggest the opposite.

During mediation, in which the defendant continued to have no legal representation, the Government alleges that she made various 'threats' through the mediator, involving her demand request and the actions that she intended to take. However, these 'threats,' which are contained in truncated handwritten notes taken by the mediator, occurred over the course of many conversations, in which the defendant not only discussed her emotions and the hurt,

fear, and pain that she was feeling, but also her concern over her potential future inability to conceive. She also made statements about legitimate actions that she was considering taking against Victim-1, including the filing of a lawsuit or criminal charges, and her motivations for doing so. Indeed, the defendant stated that she was not worried about the money, and repeatedly expressed her desire for Victim-1 to take "responsibility," and that she was seeking "justice" in the form of a "public lawsuit," although she acknowledged that "anything can happen," in court, and that she could "win or lose." USAO_0002621-2650.

The mediator's notes conspicuously reveal that the defendant had an overriding objective, which was to seek "justice" against Victim-1 for his misconduct, both in the manner in which he engaged in sexual intercourse with her, but also in his knowing transmission to her of an incurable sexually transmitted disease with potential lifelong devastating consequences. She wanted her day in court. There is no doubt, victims of crimes often want the perpetrator punished. To be clear, a review of the entirety of the mediator's notes – and not a few handpicked statements – reveal the defendant discussing her legitimate legal options, as well as her candid emotions and feelings, and not a pattern of extortion or threats.

Crucially, once the mediator was unable to negotiate a settlement, Victim-1 contacted the defendant directly, asking that the defendant meet Victim-1 in person to talk. USAO_0003002.   But the defendant was not interested in blackmailing Victim-1 or squeezing money out of him in non-legal ways.  Instead, she retained counsel.  The lawyer that the defendant retained was Tyrone Blackburn, an attorney based in New York City. This, more than anything, was the defendant's biggest mistake, as all communications prior to Mr. Blackburn being retained remained confidential and with an aim towards a resolution.

Once Mr. Blackburn was retained, he escalated the nature of the settlement negotiations, making statements, allegedly on behalf of Ms. Luo, that the Government found to be extortionate.

Unbeknownst to the defendant, Mr. Blackburn has engaged in an unethical manner of practicing law, threatening a multitude of individuals with the publishing of false allegations under the cloak of the judicial system, and using shakedown tactics that masquerade as lawyering. Judges in this District have noted this attorney's improper and unethical behavior. The Honorable J. Paul Oetken issued a "warning to" Mr. Blackburn, because his "filings are replete with inaccurate statements of law" and "full of similar irrelevant insults, misstatements, and exaggerations." *Jones v. Combs*, No. 24-cv-1457,2025 U.S. Dist. LEXIS 54277, at *10 (S.D.N.Y. Mar. 24, 2025). Judge Oetken, in discussing Mr. Blackburn's misunderstanding of a simple tenant of criminal law, stated: "That any licensed member of the bar would espouse such an absurd understanding of the law is not just disturbing, but shocking." *Id.* The Honorable Judge Denise Cote stated Mr. Blackburn "improperly files cases in federal court to garner media attention, embarrass defendants with salacious allegations, and pressure defendants to settle quickly." *Zunzurovski v. Fisher*, No. 23-cv-10881, 2024 U.S. Dist. LEXIS 62568, at *14 (S.D.N.Y. Apr. 3, 2024). On April 3, 2024, Judge Cote referred Mr. Blackburn to the Court's Grievance Committee. 23-CV-10881(DLC).

Recently, Mr. Blackburn told New Jersey U.S. District Judge Jamel K. Semperin that he is seeking a leave of absence and withdrawing from several pending cases because he is grappling with deteriorating mental health. 25-CV-17979 (JKS). In another case, which is pending in this District and includes Mr. Blackburn as a defendant, Mr. Blackburn gave

different excuses for his behavior, saying that he was recovering from two medical procedures and that he would not be able to attend depositions. *Cartegena v. Dixon*, 25-CV-3552 (JLR).  In the *Cartegena* case, Mr. Blackburn is also accused of threatening to go public with allegations of individuals who are not even his clients, making false statements that he had spoken to crucial witnesses when he had not, admitting to having never seen video evidence that he previously claimed he had seen, and engaging in similar conduct as in this case, where he has threatened to leverage public disgrace in an attempt to settle for large sums of money. In the instant matter, Mr. Blackburn inserted himself and immediately resorted to similar tactics, without the consent or directive of the defendant.  Crucially, he told the defendant that any statement he made to opposing counsel could not get her into legal trouble, as they were protected by the Federal Rules of Evidence that govern settlement discussions.  Mr. Blackburn's proclaimed knowledge of the law in this respect is wrong, but the defendant did not know that.  Mr. Blackburn's statements are instructive when evaluating his actions, as well as the knowledge and intent of the defendant. Mr. Blackburn seemingly believed that whatever he said to opposing counsel was protected as legitimate settlement negotiations.  The defendant certainly believed this advice from her counsel.

In April 2025, during a settlement conference with opposing counsel, Mr. Blackburn made several statements, incredibly claiming that he was doing so at the direction of the defendant.  The defendant was not present for this conference, nor did the defendant know, much less authorize, Mr. Blackburn to make the statements that form the basis for Counts One, Two, and Three.  Specifically, Mr. Blackburn stated that there were "multiple cameras in the apartment" and that "he saw at least a portion" of them, and that the defendant wants to "cause pain" to Victim-1, and that she would pursue civil litigation and criminal charges

absent a resolution. USAO_0002971.  Following the meeting, counsel for Victim-1 sent an email asking Mr. Blackburn to confirm that Mr. Blackburn had made such statements.  Not only did Mr. Blackburn confirm that he had made the statements, but he also volunteered that "[he] wants to make sure that you do not forget that she said she has at least three to four cellular phones, and she wants to bring pain to your client's adult children."  USAO0002970.

These statements, whether protected as negotiations in furtherance of a settlement or not, are sophomoric and misguided, particularly when they come from an attorney. However, as the Government takes the position that such statements amount to extortionate threats, it is confounding that Mr. Blackburn, who has a consistent and documented history of making such statements during settlement negotiations in many cases in this District, was not charged.  Instead, the defendant, a non-lawyer who speaks English as a second language and who was told by Mr. Blackburn that anything *he* said was protected by the Federal Rules of Evidence as part of settlement negotiations and could not get her into trouble, was the only one charged. The Government's selective decision to only prosecute Ms. Luo is confounding.

## Legal Standard on a Motion to Dismiss

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute."  *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012).  When deciding a motion to dismiss an indictment for failure to state an offense, a district court is required to accept all factual allegations in the indictment as true.  *United States v. Clarke*, No. 05-Cr-17 (DAB), 2006 WL 3615111, *1 (S.D.N.Y. Dec. 7, 2006).

## **Count One - The Government's Wire Fraud Theory is Insufficient**

Critically, the Indictment does not allege that Ms. Luo pursued a frivolous case or sought monetary damages for which she was not entitled. Instead, the Indictment makes clear that Victim-1 was not only willing to engage a mediator to reach an appropriate resolution, but that he agreed to pay the defendant $6.5 million dollars. Then, after the settlement was agreed to and signed, and $1 million dollars had been paid to the defendant, Victim-1 was willing to re-negotiate the terms of the settlement, after being informed that the defendant discovered that Victim-1 had given her a sexually transmitted disease. Certainly, Ms. Luo had a recognizable claim of right to the damages she was seeking.

The wire fraud statute, 18 U.S.C. §1343, criminalizes the use of the wires in furtherance of "any scheme or artifice to defraud." Significantly, the Indictment does not allege a single false statement or affirmative misrepresentation made by, or on behalf of, the defendant, as necessary to predicate the charge of wire fraud. Presumably, the Indictment refers to the allegations of sexual misconduct, the transmission of an STD, and the possession of video surveillance. However, by all accounts, the statements were not false, as Victim-1 was repeatedly willing to engage in settlement negotiations to compensate the defendant for the harm that the defendant alleged that Victim-1 caused her. Indeed, the negotiations, in the first instance, progressed to the point where Victim-1 agreed to pay the defendant millions of dollars, based on her allegations.

The Government can do nothing more than speculate that such statements were not true. However, the objective evidence and actions by Victim-1 do not support their theory of prosecution. In addition, representations made by the defendant's counsel, if true, corroborate the existence of the video surveillance. For these reasons, the government's

pursuit of a 'scheme to defraud' based on false statements is ill-conceived, conclusory, and insufficient. Their theory fails. In the accompanying request for a bill of particulars, we seek clarification on the specific false statements the Government alleges were made by Ms. Luo.

At its core, the wire fraud charge, as applied here, is a specious and dangerous attempt by the Government to regulate the practice of civil law, impose their own views of when and what constitutes adequate settlement negotiations, and convert alleged violations of state ethics into a federal criminal offense, based primarily on statements by a plaintiff's attorney – and not the plaintiff.

The United States has a "system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent." *Gomez v. City of New York*, 805 F.3d 419, 424 (2d Cir. 2015). Because the law in fact "presume[s] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so…," *id.*, it necessarily presumes that the attorney has the authority to negotiate towards a settlement. However, the client cannot be held responsible for the statements, whether true, false, or exaggerated, when made by the attorney and based on the attorney's strategy when negotiating in pursuit of the settlement, particularly when the client is not even present for such statements.

Settlement negotiations typically are dynamic and fluid – their course can be altered on a moment's notice based on leverage, tactics, perceptions, body language, new information, and countless other factors. Moreover, settlement demands are, by accepted practice, often unrealistic and imbued with "puffery or posturing rather than a fair or realistic appraisal of a party's damages." *Vermande v. Hyundai Motor America, Inc.*, 352 F.Supp.2d 195, 203 (D. Conn. 2004). That the Government believes that a plaintiff may be charged with wire fraud,

on her own and not as part of a conspiracy, based on the plaintiff's demands and threats made by her lawyer during settlement negotiations with the client's adversary, is disturbing, particularly when the lawyer is notorious for acting unethically but has not been charged for his criminal conduct.

Lawyers are entrusted with considerable discretion in representing their clients in the complex world of legal rights and obligations. Clients rely on the training, expertise, and judgment of their lawyers. To be sure, clients must consent to a lawyer's representation, and the lawyer must pursue the objectives of the clients, but this does not mean that lawyers act with authority only when the client micro-manages the lawyer's activities, approving every communication, every decision, every nuance. *American Family Mut. Ins. Co. v. Zavala*, 392 F.Supp.2d 1108, 1116 (D. Ariz. 2003). To the contrary, the lawyer uses his skill and expertise, in combination with the facts that he has been given, to pursue a desired outcome. Here, the gravamen of the Indictment is based on statements made by the defendant's lawyer while in the heat of settlement negotiations. Whether the defendant-client was aware of, or authorized the lawyer to make such statement, is unclear. Nonetheless, in either scenario, a theory of prosecution based upon such statements is insufficient.

### The Wire Fraud Statute is Vague-as-Applied

Allowing this prosecution of the defendant in this circumstance would violate her Fifth Amendment right to due process. A criminal statute "must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States*

*v. Rahman*, 189 F.3d 88, 116 (2d Cir. 1999) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The "statute must give notice of the forbidden conduct and set boundaries to prosecutorial discretion." *United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003). When analyzing a vagueness challenge, "[a] court must first determine whether the statute gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir. 1993). A "void for vagueness" challenge "does not necessarily mean that the statute could not be applied in some cases but rather that, as applied to the conduct at issue in the criminal case, a reasonable person would not have notice that the conduct was unlawful and there are no explicit standards to determine that the specific conduct was unlawful." *United States v. Sattar*, 272 F.Supp.2d 348, 357 (S.D.N.Y. 2003).

The resolution of a defendant's void for vagueness challenge ordinarily requires "a more expansive factual record to be developed at trial." *See United States v. Hoskins*, 73 F.Supp.3d 154, 166 (D.Conn. 2014); *United States v. Milani*, 739 F.Supp. 216, 218 (S.D.N.Y. 1990). Here, however, the Court need not wait until trial because, as explained above, a prosecution based primarily on allegedly false statements, without any basis for establishing their falsity, and in the context of settlement negotiations both with a mediator and then through retained counsel, does not provide notice to a reasonable person that such conduct is unlawful, and must fail as a matter of law.

### Count Two - Extortion: The Requirement of "Wrongfulness"

Title 18, United States Code, Section 875(d) provides that,

Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another … shall be fined under this title or imprisoned not more than two years, or both.

(Emphasis added).  Title 18, United States Code, Section §1951(a) provides that,

Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do,… shall be fined under this title or imprisoned not more than twenty years, or both.

The term "extortion" is defined in §1951(b)(2) as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  (Emphasis added).

Extortion requires proof of "wrongfulness."  *See generally, United States v. Clemente*, 640 F.2d 1069, 1077 (2d Cir. 1981) (discussing §1951); *United States v. Jackson,* 180 F.3d 55, 67-71 (2d Cir. 1999), *on reh'g*, 196 F.3d 383 (2d Cir. 1999) (concluding that although §875(d) does not define "extortion," the "intent to extort" element in §875(d) incorporates a "wrongfulness component" similar to §1951).  Accordingly, this Count must be dismissed because the allegations, even as accepted as true, do not describe "wrongful" conduct under the law.

## As a Matter of Law, The Conduct Alleged is not "Wrongful"

 The Hobbs Act does not define the term "wrongful," leaving courts to determine on a case-by-case basis whether particular conduct falls within the statute's scope.  *United States v. Albertson*, 971 F.Supp. 837, 842-43 (D.Del. 1997).  Because extortion may be committed through various means - such as violence, force, economic fear, or under color of official

right - courts have grappled with how to interpret "wrongfulness" in differing contexts. In traditional extortion cases involving threats of force or violence, the analysis is straightforward. The law clearly recognizes that threatening physical harm to obtain payment, even money to which one may be entitled, is inherently wrongful *See, e.g., Barbaro v. United States*, No. 04-Cv-1500 (TPG), 2005 WL 991908, *3 (S.D.N.Y. Apr. 27, 2005) ("Physical injury and violence are inherently wrongful...").

By contrast, when the alleged extortion involves economic fear under § 1951 or reputational threats under § 875(d), the analysis becomes more nuanced because "the line separating the legitimate economic threat from the wrongful (and hence extortionate) demand can be a fine one indeed." *Albertson*, 971 F.Supp. at 843. The difficulty arises because neither economic pressure nor reputational harm is inherently wrongful. *Clemente*, 640 F.2d at 1077 ("It is obvious that the use of fear of financial injury is not inherently wrongful."); *United States v. Jackson*, 180 F.3d at 69. ("a threat to cause economic loss is not inherently wrongful").

"The fear of economic loss is an animating force of our economic system." *United States v. Pendergraft*, 297 F.3d 1198, 1206 (11th Cir. 2002). As the Sixth Circuit explained, extortion law often criminalizes conduct that would otherwise be lawful if viewed in isolation. *See United States v. Coss*, 677 F.3d 278, 285 (6th Cir. 2012). Scholars have long struggled to articulate a principled distinction between hard bargaining and criminal extortion. As a result, the boundaries of "wrongful" conduct in economic extortion cases remain imprecise and, at times, inconsistent. *Albertson*, 971 F. Supp. at 849 (questioning the principled basis for distinguishing lawful from unlawful conduct and emphasizing fair notice concerns). The difficulty in defining the contours of "wrongful" extortion using economic

fear stems from the risk that the statute will be applied to punish hard and lawful bargaining. This case illustrates that tension.

The defendant is charged based on speech and statements made during mediation and settlement discussions. Each statement attributed to Ms. Luo in the Indictment was, standing alone, lawful and protected by the First Amendment. She had the right to disclose truthful information regarding alleged misconduct. She had the right to pursue settlement through mediation and through counsel. She had the right to make substantial—or even aggressive—settlement demands, as is common practice in civil litigation. And Victim-1 had no inherent entitlement to avoid public disclosure of his own alleged wrongdoing.

Thus, the relevant question is what combination of circumstances renders these independently lawful acts of protected speech -- which include economic fear and threats to reputation -- "wrongful" under the extortion statutes, such that they are "integral to criminal conduct" and not protected by the First Amendment. *Stevens*, 559 U.S. at 471. The case law provides some guidance but, in the end, lacks consistency. Yet one proposition seems clear: there is a societal danger inherent in criminalizing threats to reputation, or the exploitation of fear, by attorneys pursuing settlements during agreed-upon settlement discussions. For that reason, the courts have crafted exceptions to the "wrongfulness" requirement, thereby exempting certain categories of economic fear inducing behavior from the reach of the extortion statutes as a matter of law.

At one end of the spectrum is the use of economic fear or threats to reputation to collect a debt that one is legitimately owed, justified by a plausible claim of right. Thus, "the purchaser of an allegedly defective product may threaten to complain to a consumer protection

agency or to bring suit in a public forum if the manufacturer does not make good on its warranty. We doubt that Congress intended §875(d) to criminalize acts such as these." *See Jackson,* 180 F.3d at 67, 70-71.   To be sure, the Second Circuit in *Jackson* made it clear that it is not wrongful to threaten the reputation of another if the threatener has, or reasonably believes he/she has a plausible claim of right, and the threatened disclosures have a nexus to that claim of right. *Id.* at 71.

At the opposite end are classic shakedowns lacking any plausible claim of right. In *Clemente,* for instance, a waterfront "boss" demanded payments in exchange for avoiding work stoppages unrelated to any legitimate labor dispute. 640 F.2d at 1078. Similarly, in *Jackson*, Autumn Jackson's demand for $40 million from Bill Cosby in exchange for withholding a story about alleged paternity was wrongful because she had no viable legal claim to the money; the payment would not have resolved any cognizable cause of action. Also wrongful are threats that lack any nexus to a claimed entitlement—such as threatening to expose unrelated personal misconduct solely to compel payment. *See, United States v. Klos*, 2012 WL 4120413, at *2 (D. Ariz. Sept. 19, 2012) (threat to expose marital infidelity to collect a debt is wrongful where no connection exists between the infidelity and the debt).

Distinct from both extremes are litigation-related threats. Courts have generally declined to treat such threats as extortion because litigation is inherently coercive and frequently involves economic and reputational pressure. Attorneys routinely warn of lawsuits, adverse publicity, and significant damages as leverage in settlement discussions. The Second Circuit vacated sanctions against an attorney who threatened reputational harm, recognizing that lawyers may assert colorable claims and speculate about their consequences. *See, Revson v. Cinque & Cinque*, P.C., 221 F.3d 71, 80 (2d Cir. 2000). The Second Circuit

has also cautioned against restricting attorney speech absent compelling justification. *See, Susman v. Bank of Israel*, 56 F.3d 450, 459 (2d Cir. 1995).

In fact, while one might expect that a bad-faith threat to file a completely frivolous claim is "wrongful" under the extortion statutes, it is not. The law accepts that using fear of economic injury by threatening litigation can never be punished as extortion because "a lawsuit filed by lawful means is not 'wrongful' as defined by the Hobbs Act, and courts would be wary of holding that the 'filing of a meritless lawsuit is ... extortionate lest every unsuccessful lawsuit lead to an extortion claim and thus chill resort to the courts.'" *Bouveng v. NYG Capital, LLC,* 175 F.Supp.3d 280, 320 (S.D.N.Y. 2016) (Gardephe, J.) (citations omitted). Indeed, "even threats of meritless litigation or the actual pursuit of such litigation, have been held not to constitute acts of extortion..." *Id.*

In light of this well-recognized carve-out for litigation threats, it plainly was acceptable (*i.e.,* not extortionate) for Ms. Luo to threaten to file a lawsuit against Victim-1 or to file a criminal complaint based on the conduct of Victim-1. As alleged, the Indictment fails under the Second Circuit's decision in *Jackson*, where the Court found error in the district court's failure to instruct the jury that "wrongfulness" was an element of §875(d), holding that "not every threat to make a disclosure that would harm another person's reputation is wrongful," and "it is material whether the defendant had a claim of right to the money demanded." *Id.* at 70. Under *Jackson*, "wrongfulness" is a required element of § 875(d), and it turns in part on whether the defendant had a plausible claim of right. In *Jackson*, the Court ultimately found harmless error because no rational juror could conclude that the defendant had a legitimate claim to the money demanded.

Here, the Indictment does not allege that Ms. Luo lacked a claim of right; rather, the

totality of the circumstances suggests the opposite. In the first instance, Victim-1 agreed to enter mediation based on Ms. Luo's allegations that he committed acts of sexual misconduct. Based on those allegations, Victim-1 subsequently agreed to pay Ms. Luo millions of dollars. Although the initial Complaint alleges that Victim-1 entered into mediation, and agreed to a settlement, to avoid "harassment" and "potential public embarrassment," his willingness, through his attorneys, to resume mediation and re-open settlement discussions after Ms. Luo discovered she had been infected with HPV-16, reveals Victim-1's belief that Ms. Luo had a plausible claim to such monetary damages. Indeed, any threat to file a civil suit or criminal complaint – and to similarly expose such claims publicly – was related to Ms. Luo's valid claim. There is no plausible allegation that Ms. Luo was threatening to expose misconduct that was separate and apart from her grounds for monetary and equitable remedies.

The analysis here must be informed by the principle that a criminal statute "must be strictly construed, and any ambiguity must be resolved in favor of lenity." *United States v. Enmons*, 410 U.S. 396, 411 (1973). The rule of lenity "promotes fair notice of prohibited conduct and reduces the likelihood that unintentionally criminal conduct will be penalized." *United States v. Kozminski*, 487 U.S. 931, 952 (1988). The risk of arbitrary enforcement would be intolerable if prosecutors, who often have no experience in settling, litigating, trying or valuing complex civil cases, were permitted to draw lines in deciding whether a settlement demand, made in agreed-upon settlement discussions, was too high and thus "wrongful." Settlement demands are, by accepted practice, often unrealistic and imbued with "puffery or posturing rather than a fair or realistic appraisal of a party's damages." *Vermande v. Hyundai Motor America, Inc.*, 352 F.Supp.2d 195, 203 (D.Conn. 2004). Further, there is simply no way to value a client's willingness to give up equitable relief to

right a perceived wrong.  Here, a critical fact is that Victim-1 was going to receive something

of value in return for the payment – the settlement of Ms. Luo's legal claim – which

distinguishes this case from *Jackson,* where she had **no** claim.


## The Extortion Statutes are Vague-as-Applied

Allowing this prosecution of Ms. Luo in view of extortion jurisprudence on

"wrongfulness" would violate her Fifth Amendment right to due process.  As stated, a

criminal statute "must 'define the criminal offense with sufficient definiteness that ordinary

people can understand what conduct is prohibited and in a manner that does not encourage

arbitrary and discriminatory enforcement.'"  *United States v. Rahman*, 189 F.3d 88, 116 (2d

Cir. 1999) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  As detailed above, he

"statute must give notice of the forbidden conduct and set boundaries to prosecutorial

discretion."  *United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003).   In the context of

an attorney trying to settle a claim on behalf of his client, during agreed-upon settlement

meetings and communications, as in this case, the statutes at issue and the case law

interpreting those statutes at best provide insufficient guidance and leave a vacuum filled by

vagueness. This analysis also pertains to the agreed-upon settlement meetings involving Ms.

Luo.  The "wrongfulness" element of the extortion statute is vague as applied to Ms. Luo's

alleged conduct when considered against the backdrop of prevailing extortion jurisprudence,

her freedom of speech under the First Amendment, the zone of confidentiality expected in

settlement and mediation negotiations, and the accepted practices of "puffery" and

"posturing" in making settlement demands. The vagueness is further compounded by the

existence of the "litigation privilege" and the mediator's confidentiality agreement which – at

a minimum for defamation purposes -- contemplates a zone of protection for statements made in letters between attorneys and parties and during mediation interviews and offers of settlement by attorneys. *See, e.g., Officemax, Inc. v. Cinotti*, 966 F.Supp.2d 74, 79-81 (E.D.N.Y. 2013). As such, the Fifth Amendment and rule of lenity requires dismissal of this Count of the Indictment.

### Count Three – Blackmail – Consideration of Not Informing

The above arguments are re-iterated and pertain to Count Three, charging blackmail, which must also be dismissed for the same reasons. Here, Victim-1 was negotiating and was going to receive something of value in return for the potential payment – the settlement of Ms. Luo's legal claim – which distinguishes this case from *Jackson,* where she had **no** claim. The settling of a claim and, thus, not pursuing a civil or criminal matter, is a routine and justifiable point of negotiation, and not a 'consideration of not informing,' as is contemplated by this statute.

### The Indictment Violates Ms. Luo's Rights Under the Fifth Amendment Due Process Clause

A prosecutor's discretion to bring charges is "subject to constitutional constraints." *United States v. Batchelder*, 442 U.S. 114, 125 (1979). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment, is that the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong¸* 517 U.S. 456, 464 (1996). A claim of selective prosecution draws on "ordinary equal protection standards." *Id.* at 465. A defendant must show that the "federal prosecutorial policy 'had a

discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Thus, to succeed on a claim of selective prosecution, a defendant must establish that he/she was "treated differently from other similarly situated individuals" and that "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [the defendant]." *United States v. Stewart*, 590 F.3d 93, 121 (2d Cir 2009).

The standard for obtaining discovery on claims of vindictive prosecution and selective prosecution is the same. *Id.* To obtain discovery, the defendant must provide "some evidence tending to show the existence of the essential elements of the defense." *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974) (quoted in *Armstrong*, 517 U.S. at 468). Admittedly, the standard is a "rigorous" one, to serve as a "significant barrier to the litigation of insubstantial claims," as courts are understandably reluctant to "exercise judicial power over a 'special province' of the Executive." *Armstrong*, 517 U.S. at 464. A "presumption of regularity" supports prosecutorial decisions, and the clear evidence needed to undermine the presumption that prosecutors have "properly discharged their official duties" is most often elusive. *Id.* The standard for obtaining discovery, however, should not be an impossible one. In this case, Ms. Luo has made a sufficient showing to obtain discovery on her selective prosecution claim. The evidence described above, corroborated by documents provided through discovery, is more than sufficient to entitle Ms. Luo to discovery on her selective prosecution claim.

First, there can be no serious dispute that Ms. Luo was singled out for prosecution

from the only other similarly situated individual: her former attorney, Mr. Blackburn. "[D]efendants are similarly situated … when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997); *see also United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."). "[A] defendant must show that the crimes charged and those allegedly committed by the comparator are the same or similar and arose in the similar circumstances." *United States v. Stone*, No. 19-0018 (ABJ), 2019 WL 2502929, *22 (D.D.C. Aug. 1, 2019).

Here, the Indictment alleges Tyrone Blackburn's actions to be not only similar to those of Ms. Luo but, considering his profession, ***more*** egregious. In addition, it was Mr. Blackburn who conveyed the most aggressive and over-the-top remarks, although in the context of settlement discussions. Indeed, his repeated conduct in similar cases, both in and outside of this District, establishes a concerning pattern. While we believe the case law detailed above distinguishes such statements which are made during settlement negotiations from those routinely charged under a scheme to extort, it is evident that the Government does not. As such, it should be apparent to the Government, that under their theory of prosecution, Mr. Blackburn conspired with Ms. Luo to extort Victim-1, as he contributed in conveying the relevant and, indeed, most aggressive statements detailed in the Indictment. In fact, Mr. Blackburn's statements either corroborate the fact that Ms. Luo possessed incriminating video surveillance of Victim-1, as Mr. Blackburn represented that he had viewed them, *or*,

22

he made false statements outside the scope of his conversations with his client. Either scenario is problematic for the Government.

To be clear, neither Mr. Blackburn nor Ms. Luo has committed any crime in this case; however, the Government's persistence in charging only Ms. Luo in the face of similar conduct by a similarly situated individual satisfies the first prong of the selective prosecution inquiry. Mr. Blackburn, especially after taking into consideration his conduct on other cases and the written credibility determinations and referrals to the Grievance Committee by judges in this District, is a bad actor.

As was argued above, the crime of extortion, under both 18 U.S.C. §1951 and 18 U.S.C. §875(d), requires "wrongful" behavior on the part of an accused. *See United States v. Enmons,* 410 U.S. 396 (1973); *Jackson*, 180 F.3d at 67-69. When the allegedly "extortionate" demand is made during confidential settlement discussions by a lawyer on behalf of a client pursuing a legitimate claim, the issue of "wrongfulness" is a thorny one, as courts are loath to criminalize litigation-related threats, inasmuch as criminalization naturally deters the exercise of First Amendment rights. *See United States v. Pendergraft*, 297 F.3d 1198, 1205-08 (11th Cir. 2002). Indeed, even where a party threatens frivolous litigation accompanied by false affidavits – circumstances that do not exist here – courts have refused to allow criminal liability under the extortion statutes. *Id.* The analysis of "wrongfulness" requires, among other things, an understanding of the "claim of right" at issue and whether the lawyer believed he or she was pursuing legitimate demands with a nexus to that claim of right. *Cf. Jackson, supra*.

Unlike "threatened disclosures of such matters as sexual indiscretions that have no

nexus with any plausible claim of right," *Jackson*, 180 F.3d at 70, where a client like Ms. Luo has claimed to have been wronged by a powerful person such as Victim-1, it is incumbent upon a prosecutor to engage in a more rigorous and penetrating analysis of the client's possible legal claims before prematurely concluding that her lawyer's demands constitute extortion. Litigation itself is inherently threatening and poses a risk to all parties. Yet extortion charges against attorneys for making settlement demands are beyond exceedingly rare, for reasons that make sense as a matter of public policy.  Nonetheless, if the government believed Ms. Luo's claims were extortionate, her lawyer should also be charged.

The Government's decision to indict only Ms. Luo is concerning, and may speak to the exertion of an undue influence having been exerted by Victim-1 or his law firm.  To be sure, if the Government has concluded that Mr. Blackburn committed no crime, then the Government should explain why Ms. Luo remains under indictment in this case. If Mr. Blackburn was truthful when representing that he had viewed video evidence of Victim-1's wrongdoing, then the wire fraud count should be dismissed because its predicate false statement is not false at all. If the Government has determined that Mr. Blackburn's statement was false, then why was he spared being charged as a co-conspirator?  What is the explanation for its decision to prosecute only Ms. Luo?  The facts outlined above more than satisfy the "some evidence" standard for Ms. Luo to obtain discovery on her claim of selective prosecution. Ms. Luo respectfully requests the following discovery and *Brady* disclosure from the Government on her motion:

> A. All internal documents, including memoranda, notes, e-mails, and text
> messages that, in any way, reference the reasons why Ms. Luo was arrested

and/or charged in this case;

B. All internal documents, including memoranda, notes, e-mails, and text messages that, in any way, reference the reasons why Tyron Blackburn was not arrested or charged in this case;

C. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the prosecution and the Department of Justice regarding the decision to arrest and charge Ms. Luo;

D. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the prosecution team and the Department of Justice regarding the decision not to arrest or charge Mr. Blackburn; and,

E. All oral and written communications, including but not limited to memoranda, emails, text messages, and the like, between the Government and Victim-1's law firm regarding Ms. Luo and/or Mr. Blackburn.

F. Any Government credibility assessments, internal analyses, or related materials concerning Mr. Blackburn which constitute discoverable material under <u>Brady</u> and <u>Giglio</u>, as they may contain impeachment or exculpatory information.

G. All information in the Government's possession, custody, or control regarding any pattern of conduct, credibility issues, prior judicial findings, or documented behavior of Mr. Blackburn, including but not limited to conduct reflected in judicial opinions, court orders, or other proceedings in the Southern District.

H. All proffer, immunity, and other agreements, validation assessments, payment information, and other impeachment information pertaining to Mr. Blackburn, including the existence of any cooperating agreement, notes taken of any interview with Mr. Blackburn in which he made statements that have bearing of the sufficiency and/or credibility of the Government's allegations or Mr. Blackburn's credibility, or information favorable to Ms. Luo. This includes all agreements, assessments, and impeachment information from past cases unrelated to this current case, as well as any evidence indicating the Mr. Blackburn has, in any fashion, participated in

illegal conduct.

I. The existence of any agreement between the Government or any other prosecuting agency and Mr. Blackburn.

J. All information, including statements by Mr. Blackburn or any potential witnesses or their counsel, that would support an advice of counsel defense and any evidence that Mr. Blackburn suffers, or at any time suffered, from any type of mental illness or other condition which might affect the accuracy, perception, or comprehension with respect to his representation of Ms. Luo.

## The Government Must Provide Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *United States v. D'Amico*, 734 F. Supp. 2d 321,335 (S.D.N.Y. 2010) (*quoting United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988)). *See also*, *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987). The purpose of a bill of particulars is "to supplement the facts contained in the indictment when necessary to enable defendants to identify with sufficient particularity the nature of the charges against them." *United States v. Gotti*, No. S4 02 CR 743, 2004 WL 32858, at *8 (S.D.N.Y. Jan. 6, 2004). "[W]here the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused," a bill of particulars is appropriate. *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004).

Whether to grant a request for a bill of particulars "rests within the sound discretion

of the district court." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). In deciding whether to exercise its discretion to order the government to provide a bill of particulars, "the court must examine the totality of the information [already] available to the defendant—through the indictment, affirmations, and general pre-trial discovery." *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

The decision whether to require a bill of particulars will necessarily be based on the unique facts of the case. The Court has the discretion, for example, to require a bill of particulars naming unindicted co-conspirators and, based on the unique facts of different cases, the Second Circuit has upheld decisions both granting and denying requests for particulars regarding co-conspirators. *United States v. Chalmers*, 410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006) (comparing cases). A bill of particulars is appropriate where, like here, the government has produced voluminous pretrial discovery. *See, e.g., United States v. Falkowitz*, 214 F.Supp.2d 365, 390–92 (S.D.N.Y. 2002).

The production of a large amount of discovery material "does not necessarily obviate the need for a bill of particulars. The government may not 'rely solely on the quantity of information disclosed.'" *United States v. Rajaratnam*, No. 09 CR. 1184 (RJH), 2010 WL 2788168 at *2 (S.D.N.Y. July 13, 2010) (quoting *United States v. Bin Laden*, 92 F.Supp.2d 225, 234 (S.D.N.Y.2000)). "[S]ometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars." *Bin Laden*, 92 F.Supp.2d at 234 (citing *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir.1987)). The "complexity of [the] case" and the "fact-intensive nature of its allegations" can necessitate additional particulars. *Rajaratnam*, 2010 WL 2788168 at *3 (ordering the government to provide additional detail in insider trading case including (1) all reporting periods that were the subject of inside information,

(2) the substance of the information provided for any period, and (3) the date(s) on which it was conveyed for various categories of information listed in the counts).  In contrast, the *Rajaratnam* Court declined to require the government to provide additional particulars where it had none and where the allegations were based solely on wiretap intercepts, which the defense possessed and for which the government had provided electronically searchable summary line sheets and descriptions of the relevant conversations.

The Second Circuit's decision in *United States v. Bortnovsky*, 820 F.2d 572 (2d Cir.1987), is particularly instructive.  The *Bortnovsky* Court overturned the conviction and remanded for a retrial due to the District Court's denial of a bill of particulars regarding the dates of burglaries that were allegedly fake or staged and the identification of which documents the government contended were fraudulent.  This forced the defense "to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges." *Id.* at 574-75.  Although the government had provided "mountains of documents to defense counsel" it did not fulfill its obligations where it did not inform defense counsel which documents it contended were falsified or which burglaries it contended were staged. *Id.* at 575. The circumstances of a given case are determinative. A request that may appear to seek mere evidentiary detail in one matter can, in another, reflect a genuine need for additional particulars.

Here, the Indictment's broad allegations across multiple counts spanning several months, combined with the use of generic victim identifiers, general references to "false statement" made, "materials possessed," and vague temporal references, fail to provide the essential facts necessary for the defendant to prepare an adequate defense, avoid unfair surprise at trial, and protect against future double jeopardy, thus warranting the issuance of a

bill of particulars. Without the requested particulars, the defense cannot identify with sufficient particularity the nature of the charges against Ms. Luo or the specific acts of which he is accused.

The Indictment here alleges a months-long scheme involving "false statements," "threats," and electronic communications with a single identified "Victim-1," spanning from at least November 2024 through April 2025, and is reflected in substantial volumes of digital discovery, including text messages, emails, photographs, videos, and data extracted from several electronic devices. Yet the Government has not identified which specific communications it contends were fraudulent, which statements it claims were false, or which particular messages constitute criminal "threats." Given the evolving course of communications between Ms. Luo and Victim-1 (and their attorneys), as well as the high volume of discovery, even the counts that track statutory language and might not require particulars in other cases, require them here.

Count One of the Indictment references "false statements" concerning "compromising materials and information" allegedly possessed by Ms. Luo, but the Government has not identified the precise statements it contends were false. Nor has the Government delineated which specific communications form the basis of Count One, as opposed to lawful negotiations or other exchanges, of which there were many. The communications at issue unfolded over a multi-stage negotiation process. Ms. Luo and Victim-1 initially engaged in direct negotiations. Thereafter, Ms. Luo participated in mediation without counsel, while Victim-1 was represented by an attorney. Following the acquisition of additional information, Ms. Luo resumed direct communications with Victim-1 in an effort to renegotiate. The parties then returned to mediation, with Victim-1 and his attorneys

participating. When mediation efforts ultimately broke down, Ms. Luo retained counsel, and subsequent communications proceeded through discussions between Ms. Luo's attorney and Victim-1's attorney. Across these phases—direct negotiations, mediation sessions, renewed discussions, and attorney-to-attorney communications—the exchanges necessarily involved demands, counterproposals, leverage, and characterizations of alleged conduct typical of adversarial dispute resolution. Yet the Indictment does not specify which of these communications the Government contends were criminal, which statements it claims were false, or which particular wires it intends to rely upon at trial.

Thus, the defense is thus left to sift through potentially voluminous electronic communications spanning each stage of this evolving negotiation process without knowing which specific statements the Government deems fraudulent. Unlike the prosecution in *Rajaratnam*, the Government has not identified the precise statements it contends were false, nor has it delineated which communications form the basis of Count One as opposed to lawful negotiations or other exchanges. Like the "fake burglaries" in *Bortnovsky*, knowing which particular statements and communications the Government claims were criminal is essential to the preparation of the defense. *See Bortnovsky*, 820 F.2d at 574–75.

With respect to the Extortion and Blackmail charges (Counts Two and Three), the Government has produced numerous text messages, emails, letters, and other communications directly between Ms. Luo and Victim-1, as well as communications involving Ms. Luo's counsel and Victim-1's counsel. Yet without the requested particulars, the defense will be left to address every conversation, every draft proposal, and every document, every written or electronic communication in an effort to anticipate which statements the Government intends to characterize as extortionate or blackmail. Specifically,

Count Two of the Indictment alleges that Ms. Luo "threatened to report allegations of wrongdoing" to investors, business partners, and the media, yet it does not specify what those alleged "wrongdoing" claims were. The phrase "wrongdoing" is left entirely undefined. It could refer to alleged criminal conduct, civil regulatory violations, ethical breaches, or purely reputational accusations. Some categories of alleged misconduct—if true—could constitute federal offenses and others might not be criminal at all. Without identifying the substance of the alleged wrongdoing, the Government fails to clarify what Ms. Luo allegedly threatened to disclose and why such disclosure would give rise to criminal liability under the Hobbs Act.

Count Three suffers from the same defect, as it alleges a "threat of informing" concerning violations of federal bribery statutes. The Indictment, however, does not specify what underlying conduct the Government claims constituted such bribery, how it allegedly satisfied the elements of 18 U.S.C. §§ 201 or 666, or what precisely Ms. Luo purportedly threatened to disclose. The absence of specificity regarding which communications form the basis of Counts Two and Three, combined with the broad time frame alleged in the indictment, prevents the defense from meaningfully focusing its investigation and trial preparation and creates a substantial risk of prejudicial surprise at trial. Without particulars identifying the specific statements, demands, and threats at issue, the defense is effectively tasked with preparing to explain the entirety of Ms. Luo's relationship and negotiations with Victim-1, rather than the discrete acts the Government contends were criminal.

Based on the totality of circumstances in this case, the Court should, therefore, compel the government to provide the particulars requested below. Each is necessary to the effective preparation of Ms. Luo's defense, to prevent surprise, and to protect against future

double jeopardy violations.

## The Following Particulars are Necessary to the Defense

The defense submits that the following particulars related to the identification of specific communications, the precise false statements, the alleged "wrongdoing," the Government's theory of the interstate commerce element, and alleged criminal acts are necessary in order to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense[s]."

With respect to Count 1, defendant requires particulars identifying:

(1) The specific false statements or misrepresentations allegedly made;

(2) the dates and means of the specific wire communications alleged to further the scheme;

(3) the particular "compromising materials and information" referenced; and

(4) which communications constitute the execution of the scheme, as opposed to negotiations, posturing, or other non-criminal exchanges.


With respect to Count 2, defendant requires particulars identifying:

(1) The specific communications that allegedly constitute "threats" and the dates and manner in which such threats were conveyed;

(2) the precise "allegations of wrongdoing" referenced;

(3) the particular businesses, investors, or partners allegedly referenced;

(3) how, specifically, interstate commerce was obstructed, delayed, or affected; and

(4) the specific amounts demanded and when.

With respect to Count 3, defendant requires particulars identifying:

(1) The specific threat to "inform" and to whom;

(2) the particular bribery allegations defendant allegedly threatened to report;

(3) the specific "thing of value" demanded; and

(4) the particular federal bribery violations the Government contends were implicated.

With respect to Count 4, defendant requires particulars identifying:

(1) Which specific acts constitute the charged obstruction.

## The Court has the Discretion to Order the Requested Bill of Particulars

The Court has the discretion to order the requested particulars because they are necessary to the preparation of Ms. Luo's defense, to prevent surprise, and to protect against future Double Jeopardy violations. This case is fact-intensive and turns almost entirely on communications (i.e. texts, emails, electronic messages, photographs, and videos) over a multi-month period. The Government has produced substantial volumes of digital discovery. But as the Second Circuit held in *Bortnovsky*, the mere production of "mountains of documents" does not relieve the Government of its obligation to identify which statements, communications, or materials it contends are criminal. A bill of particulars is necessary to delineate the boundary between lawful conduct and the specific acts the Government claims were criminal. Without that guidance, the defense is forced to sift through potentially

thousands of communications in an attempt to guess which ones the Government will rely upon at trial. A narrowly tailored bill of particulars addressing the specific deficiencies identified above would serve the legitimate purposes of Rule 7(f) without improperly compelling evidentiary disclosure.

## **CONCLUSION**

For the foregoing reasons, Ms. Luo respectfully requests that the Court dismiss the Indictment against her or, in the alternative, grant her request for limited discovery and issue an order requiring the government to file a bill of particulars identifying the above-specified information.

Respectfully submitted,


_____/s/_____
Arthur L. Aidala, Esq.
Michael T. Jaccarino, Esq.
Alexandra Jo Debenedictis, Esq.
Aidala, Bertuna & Kamins, P.C

*Attorneys for Changli Luo*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 20, 2026, I caused a true and correct copy of the foregoing

to be served by electronic means, via the Court's CM/ECF system, on all counsel registered

to receive electronic notices.


_____/s/_____
Arthur L. Aidala