UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - *v.* - | : | 25 Cr. 412 (MMG) |
| CHANGLI LUO, a/k/a "Sophia Luo," | : | |
| Defendant. | : | |

**<u>THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SEVER</u>**

JAMES M. MCDONALD
United States Attorney
Southern District of New York

Jackie Delligatti
Qais Ghafary
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS


I. STATEMENT OF FACTS .......... 5

A. Procedural History .......... 5

B. Overview of the Charged Offenses .......... 6

i. Luo's Scheme to Blackmail, Extort, and Defraud Victim-1 .......... 7

ii. Luo's Fraud and Theft Against Victim-2 and Victim-3 .......... 10

II. APPLICABLE LAW .......... 12

III. DISCUSSION .......... 13

1. The Charges Are Part of a Common Scheme or Plan .......... 13

2. Evidence of the Conduct Underlying Counts Five Through Seven Would Be Admissible At Trial Even If The Counts Were Severed .......... 17

3. Luo Cannot Demonstrate Substantial Prejudice from Joinder .......... 18

IV. CONCLUSION .......... 19

# TABLE OF AUTHORITIES

Page(s)

Cases

*Blaszczak v. United States,*
141 S. Ct. 1040 (Jan. 11, 2021)........ 18
*United States v. Amato*,
15 F.3d 230 (2d Cir. 1994)........ 12, 16
*United States v. Bezmalinovic,*
1996 U.S. Dist. LEXIS 18976 (S.D.N.Y. December 26, 1996) ........ 15
*United States v. Blakney*,
941 F.2d 114 (2d Cir. 1991)........ 12, 18
*United States v. Blaszczak*,
947 F.3d 19 (2d Cir. 2019)........ 18
*United States v. Bonventre*,
646 F. App'x 73 (2d Cir. 2016) ........ 14
*United States v. Epps*,
742 F. App'x 544 (2d Cir. 2018) ........ 14, 15
*United States v. Feyrer*,
333 F.3d 110 (2d Cir. 2003)........ 16
*United States v. Page*,
657 F.3d 126 (2d Cir. 2011)........ 13, 18
*United States v. Pizarro*,
No. 19-2391, 2023 WL 3332539 (2d Cir. May 10, 2023) ........ 12
*United States v. Rivera*,
546 F.3d 245 (2d Cir. 2008)........ 18
*United States v. Ruiz*,
894 F.2d 501 (2d Cir. 1990)........ 12, 14, 15, 16
*United States v. Saad*,
380 F. Supp. 2d 286 (S.D.N.Y. 2005)........ 16
*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998)........ 18
*United States v. Salemo*,
499 F. App'x 110 (2d Cir. 2012) ........ 14
*United States v. Tubol,*
191 F.3d 88 (2d Cir. 1999)........ 15
*United States v. Turoff*,
853 F.2d 1037 (2d Cir. 1988)........ 12

*United States v. Werner*,
620 F.2d 922 (2d Cir. 1980) ........ 13
*United States v. Wilson*,
512 F. App'x 75 (2d Cir. 2013) ........ 12, 14
*Zafiro v. United States*,
506 U.S. 534 (1993) ........ 13, 18

Rules

Federal Rule of Criminal Procedure 8(a) ........ 5, 12
Federal Rule of Criminal Procedure 14(a) ........ 5, 12, 13

The Government respectfully submits this memorandum of law in opposition to defendant Changli Luo's ("Luo" or "defendant") motion to sever Counts One through Four from Counts Five through Seven of the S1 Superseding Indictment.

Luo's argument that Counts Five, Six, and Seven are misjoined with the remaining counts in the Superseding Indictment under Federal Rule of Criminal Procedure 8(a), or should otherwise be severed under Federal Rule of Criminal Procedure 14(a), should be rejected. Because the counts in the Superseding Indictment concern conduct that was part of Luo's yearslong core scheme to defraud each of her romantic partners for her own financial gain, and trying the counts together serves judicial economy without causing unfair prejudice, Counts Five through Seven are properly joined and should not be severed.

## I. STATEMENT OF FACTS

### A. Procedural History

On or about September 11, 2025, a grand jury sitting in this District returned an Indictment charging Luo with one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count One"), one count of Hobbs Act extortion, in violation of Title 18, United States Code, Sections 1951 and 2 ("Count Two"), one count of blackmail, in violation of Title 18, United States Code, Sections 873 and 2 ("Count Three"), and one count of destruction and concealment of records in federal investigation, in violation of Title 18, United States Code, Sections 1519 and 2 ("Count Four"). As explained below, Counts One through Four related to Luo's unlawful campaign to blackmail, defraud, and extort a victim ("Victim-1") as well as to her attempts to conceal evidence of those crimes during the execution of a search warrant on her residence in or about May 2025. On or about June 30, 2026, the grand jury returned a superseding indictment (the "Superseding Indictment") that contained the same Counts One through Four but

additionally charged one count of access device fraud, in violation of Title 18, United States Code, Sections 1029(a)(2), 1029(b)(1), 1029(c)(1)(A)(i), and 2 ("Count Five"), one count of aggravated identity theft, in violation of Title 18, United States Code, Sections 1028A(a)(1), 1028A(b), and 2 ("Count Six"), and one count of identity theft, in violation of Title 18, United States Code, Sections 1028(a)(7), 1028(b)(2)(B), and 2 ("Count Seven"), relating to similar crimes Luo committed against two additional former romantic partners (named in the Superseding Indictment as "Victim-2" and "Victim-3"). On or about August 21, 2026, Luo filed a motion to sever Counts One through Four from Counts Five through Seven of the Superseding Indictment. Trial in this matter is scheduled to begin on November 16, 2026.

## B. Overview of the Charged Offenses

The evidence at trial will show that, beginning in at least 2022, Luo lured various men into intimate romantic and sexual relationships for the primary purpose of stealing their money and property. In some instances, as was the case with Victim-2 and Victim-3, Luo used sex and romance as a means to (1) steal their identities for the demonstrated purpose of making unauthorized purchases; and (2) engage in an extended grift in which she attempted to and often did convince these Victims to fund her luxurious lifestyle. With respect to Victim-1, however, Luo saw an even greater opportunity to exploit Victim-1's particular wealth and her campaign of theft and deceit reached another level. Following a one-time sexual encounter, Luo began an extensive campaign to blackmail, defraud, and extort Victim-1, which culminated in threats to harm Victim-1's reputation, business, and family if Victim-1 did not cede to Luo's demands to pay her in excess of $1 billion.

The evidence at trial will show that, although the Superseding Indictment charges conduct against three different Victims, Luo's conduct with respect to each Victim was remarkably similar.

Over the course of several years, from at least 2022 through at least 2025, Luo extracted and attempted to extract an ever-increasing amount of money, clothing, electronics, and other luxury items from her romantic partners using tactics including, but not limited to, lies, deceit, and old-fashioned theft.

### i. Luo's Scheme to Blackmail, Extort, and Defraud Victim-1

The allegations against Luo relating to Victim-1 are largely described in detail in the criminal complaint that was filed against Luo on or about June 14, 2025, (Dkt. 1, Compl.), and summarized herein.

In or around November 2022, Luo cold-messaged Victim-1 via LinkedIn to purportedly discuss a business endeavor. Luo and Victim-1 had a handful of in-person meetings thereafter, including a June 2023 lunch at a restaurant near Luo's midtown Manhattan apartment. Based on Victim-1's LinkedIn profile and these meetings, Luo knew that Victim-1 had substantial wealth and prominence. In June 2023, after the above-described lunch, Luo invited Victim-1 back to her apartment, where they had a sexual encounter (the "Sexual Encounter"). Several days after the Sexual Encounter, and after only having met Victim-1 in person no more than three times, Luo sent Victim-1 a letter via text message in which she professed her love for Victim-1.

In the weeks and months that followed, Luo's communications to Victim-1 turned from flattering to threatening. For example: in May 2024, Luo sent two letters to Victim-1 via text message in which she accused Victim-1, among other things, of having misled Luo in order to have sex with her, and, in the alternative, of having sex with Luo while she was mentally incapacitated or mentally disabled. Luo stated in these letters that she had captured the Sexual Encounter on cameras in her apartment and that she would expose the Sexual Encounter to the media if Victim-1 did not apologize. In the letters, Luo also threatened to expose purported

criminal activity by Victim-1 to law enforcement, Victim-1's business partners, and Victim-1's family and friends. After conveying these threats, Luo provided Victim-1 with the information for a certified mediator and demanded that Victim-1 respond to Luo's threats within 24 hours.

In or about June 2024, after receiving these threatening letters, Victim-1 agreed to enter into mediation with Luo. Though Victim-1 denies Luo's allegations, Victim-1 has indicated that Victim-1 believed that entering into mediation with Luo would avoid harassment of Victim-1's family and potential public embarrassment. Luo continued to make similar threats to Victim-1 throughout the mediation, including that she would attempt to attack Victim-1's family and ruin Victim-1's reputation. In or about August 2024, Victim-1 entered into a settlement agreement with Luo in which Victim-1 agreed to pay Luo several million dollars.

Starting in or about November 2024, after the settlement agreement was executed and after Victim-1 had already made an initial payment to Luo, Luo began demanding ever-increasing additional amounts of money from Victim-1. Again through a mediator, Luo initially demanded at least $900 million and increased that demand to $1.215 billion by January 2025. Luo continued to threaten that she would report purported criminal acts to law enforcement if she was not paid. Luo also continued to threaten harm to Victim-1's personal and professional life.

Shortly after making this demand for over $1 billion, Luo hired an attorney. On or about March 29, 2025, Luo's attorney sent a message to Victim-1's attorney in which Luo's attorney conveyed an additional series of demands made by Luo. Shortly thereafter, on or about April 1, 2025, Victim-1's attorney then sent an email to Luo's attorney to confirm that its contents reflected what Luo directed her attorney to communicate to Victim-1's attorney (the "Victim-1 Attorney Email"). Specifically, the Victim-1 Attorney Email sought to confirm that Luo had directed her attorney to convey the following, in substance and in part: (i) Luo's monetary demand had

decreased from approximately $1.25 billion to $50 million; (ii) if Victim-1 did not take "responsibility," Luo was determined to "destroy" Victim-1; (iii) Luo had multiple cameras in the apartment where the Sexual Encounter occurred and Luo had at least two videos and pictures of the Sexual Encounter, which she would provide to others absent a resolution; (iv) absent resolution, Luo was prepared to report purported criminal acts by Victim-1 to "criminal investigators," Victim-1's business partners, and "the federal government." (Compl. ¶ 4.a.i-a.iv).

Later that same day, Luo's attorney confirmed the accuracy of what Luo had instructed him to convey to Victim-1's attorney. Luo's attorney also conveyed that Luo wanted Victim-1 to know that she wished to bring pain to Victim-1's children. Victim-1 did not accede to Luo's extortionate demands.

On or about May 28, 2025, the FBI searched Luo's apartment in Manhattan pursuant to a judicially-authorized warrant. During the search, Luo attempted to conceal critical evidence of her crimes. Law enforcement officers placed at least 15 phone calls to Luo between approximately 6:17 a.m. and approximately 6:33 a.m., all of which were ignored. Officers also texted Luo and announced themselves at her door in an effort to gain access to her apartment. Luo did not answer any of the calls, texts, or announcements. Instead, law enforcement officers were able to enter Luo's apartment only after obtaining a key from building staff. Officers then discovered evidence that Luo had attempted to conceal, including (1) a cellphone hidden between dirty clothes in a bathroom laundry hamper; and (2) an additional cellphone concealed within a package of sanitary pads that was recovered only after law enforcement employed the assistance of a canine that was specifically trained to detect electronic devices.

Law enforcement agents reviewed the electronic devices seized during the search of Luo's apartment. As described in more detail in the Complaint, the review of Luo's electronic devices

revealed that Luo had in fact fraudulently altered images that she then used to extort, blackmail, and defraud Victim-1. (Compl. ¶ 10). Specifically, one of Luo's cellphones contained several pornographic videos and still images wherein Victim-1's face had been grafted onto the body of another man. Forensic examination of the devices indicated that Luo superimposed Victim-1's face on the pornographic images on March 29, 2025—that is, the same day on which Luo instructed her attorney to convey to Victim-1 that Luo would distribute photos and videos of the Sexual Encounter if Victim-1 did not pay her $50 million.

**ii. <u>Luo's Fraud and Theft Against Victim-2 and Victim-3</u>**

The evidence at trial will show that, around the same time Luo began her pursuit of Victim-1, Luo used similar fraud and deception tactics to lure Victim-2 and Victim-3 into romantic relationships that ultimately resulted in the criminal conduct described in Counts Five through Seven.

In or around late 2022 or early 2023—that is, around the same time Luo reached out to Victim-1—Luo also cold-messaged Victim-2 via LinkedIn to purportedly discuss Luo's interest in renting a commercial space that Victim-2 owned. After touring the space and informing Victim-2 that she was not interested in renting the property, the two nonetheless agreed to meet again for a date. Luo and Victim-2 had drinks together on or about January 20, 2023, also at a restaurant near Luo's midtown Manhattan apartment.

At this meeting, Luo described her work with a purported non-profit and claimed that she needed a new computer to continue to operate her purported non-profit. Luo intimated to Victim-2, in substance and in part, that the two could have a sexual encounter if Victim-2 agreed to purchase Luo the new computer that she claimed to need. Immediately following their date, Luo accompanied Victim-2 to the Apple Store in midtown Manhattan, where Victim-2 purchased Luo

a new Macbook computer for approximately $2,000. After the purchase, Luo and Victim-2 went to Luo's apartment, where Luo performed oral sex on Victim-2 (the "Victim-2 Sexual Encounter"). Immediately following the Victim-2 Sexual Encounter, and without Victim-2's knowledge, Luo took photographs of the front and back of Victim-2's credit card. A few weeks later, Victim-2 noticed that someone else had charged an online Apple Store purchase totaling approximately $4,500 with his credit card. After noticing the unauthorized purchase, Victim-2 called Luo, who confirmed that she had made the unauthorized purchase and apologized for doing so. Around the same time that Luo fraudulently used Victim-2's credit card, Luo also asked Victim-2 for approximately $50,000-$100,000, which Luo claimed to need for a business opportunity. Victim-2 refused to provide Luo with any more money.

Victim-3 first met Luo in approximately 2022 or 2023, after Luo cold-called Victim-3 and purported to be soliciting donations for her supposed non-profit. After the call, Luo and Victim-3 also agreed to meet for a meal at a midtown Manhattan restaurant. Luo and Victim-3 then went on a few additional dates. After only a few in-person meetings, Luo similarly told Victim-3 that she loved him and asked Victim-3 to take her to a nearby boutique to buy her a luxury coat. In or about December 2023, Victim-3 agreed to buy Luo the coat, which cost approximately $6,000. After Victim-3 purchased the $6,000 coat for Luo, Luo suggested that the two go back to Victim-3's hotel, where they had a sexual encounter (the "Victim-3 Sexual Encounter"). On the same day that the Victim-3 Sexual Encounter took place, and without Victim-3's permission, Luo took photographs of the front and back of two credit cards belonging to Victim-3.

At or around the same time the Victim-3 Sexual Encounter took place, Luo also asked Victim-3 for more money. Specifically, she asked Victim-3 to buy her a first-class plane ticket to China for approximately $12,000. After Victim-3 instead offered to purchase Luo a coach-fare

ticket, Luo became angry and instead demanded approximately $50,000 for spending money while in China. Victim-3 refused to provide Luo with any more money.

## II. APPLICABLE LAW

Joinder under Rule 8(a) is appropriate where the counts "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Counts that have a "sufficient logical connection" to each other can be tried together, *United States v. Ruiz*, 894 F.2d 501, 505 (2d Cir. 1990), as can those "where the same evidence may be used to prove each count," *United States v. Blakney*, 941 F.2d 114, 116 (2d Cir. 1991). Joinder of counts also is appropriate where the evidence proving the counts is "interconnected and overlapping," *United States v. Amato*, 15 F.3d 230, 236 (2d Cir. 1994), such as through "some substantial identity of facts or participants" or because they "arise out of a common plan or scheme," *United States v. Pizarro*, No. 19-2391, 2023 WL 3332539, at *2 (2d Cir. May 10, 2023). This Court has "interpreted Rule 8(a) as providing a liberal standard for joinder of offenses," *United States v. Wilson*, 512 F. App'x 75, 76 (2d Cir. 2013), which "reflects a policy determination that gains in trial efficiency outweigh the recognized prejudice that accrues to the accused" when offenses are tried together, *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).

If the joinder of offenses "appears to prejudice a defendant or the government, the court may order separate trials of counts . . . or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Because Rule 8 joinder inherently "authorizes some prejudice," a defendant who "seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." *Amato*, 15 F.3d at 237. The defendant must show prejudice that is "unfair," and "not merely that [the defendant] might have had a better chance for acquittal at a separate

trial." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011); *see also United States v. Werner*, 620 F.2d 922, 929 (2d Cir. 1980) (substantial prejudice requires more than "the adverse effect of being tried for two crimes rather than one"). Furthermore, the prejudice must be "sufficiently severe to outweigh the judicial economy" of a joint trial. *Page*, 657 F.3d at 129.

Because Rule 14 explicitly permits a district court to "provide any other relief that justice requires," Fed. R. Crim. P. 14(a), the rule "does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion," *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993). Even in the rare circumstances where "the risk of prejudice is high," severance is not required, as "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." *Id.* at 539.

## III. DISCUSSION

All of the counts in the Superseding Indictment are properly joined. *First*, the counts are interconnected, share significant factual and evidentiary overlap, and reflect a common core criminal scheme by Luo. *Second*, evidence of Counts Five through Seven would be admissible at a trial on Counts One through Four regardless, as evidence of motive, knowledge, and intent under Federal Rule of Evidence 404(b). *Finally*, severance is improper under Rule 14(b) because there is no unfair prejudice to the inclusion of Counts Five through Seven, particularly given the overwhelming body of case law favoring judicial efficiency and joint trials.

### 1. The Charges Are Part of a Common Scheme or Plan

All charges in the Superseding Indictment are unified by a common scheme or plan: that is, Luo's years-long effort to defraud men with whom she was romantically involved through acts of deceit and dishonesty in order to obtain money, fancy clothing, and other luxury items. This is precisely the kind of scheme that courts have found to be properly the subject of a single

indictment, even when such counts may involve different acts or victims. Indeed, the Second Circuit has held that counts constitute parts of a common scheme or plan when, for example: they "all involved substantial alleged dishonesty," *Ruiz*, 894 F.2d at 505; they "involved corrupt schemes to commit crimes" of a "similar" nature, *United States v. Epps*, 742 F. App'x 544, 547 (2d Cir. 2018); they are of a "similar character" in that a defendant made misrepresentations "in order to gain benefits to which she might not have otherwise been entitled," *Wilson*, 512 F. App'x at 77; they involved means or methods that "display enough of a general likeness," *United States v. Salemo*, 499 F. App'x 110, 114 (2d Cir. 2012); or "one scheme stemmed from the other," *United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016).[1]

The evidence will show that Luo's actions with respect to each of the three Victims described in the Indictment were part of a core scheme comprised of several acts of a "similar character." *Wilson*, 512 F. App'x at 77. First, Luo's "means" and "methods" were remarkably similar. Luo made cold outreach to each individual (at least twice over the same online professional networking platform), purportedly under the guise of wanting to discuss a business or professional interest. All of these cold contacts were initiated in late 2022 through early 2023. Luo persistently requested in-person meetings with all three Victims, which took place at well-appointed restaurants and hotels around Manhattan. Luo began by offering the prospect of romance or sex with her Victims in order to obtain nice meals, unique experiences, and other luxury items of interest. And once Luo succeeded in engaging each victim, Luo attempted to and did steal from these Victims following each of the Sexual Encounters. For at least two victims, Victim-1 and

[1] Luo appears to ignore this controlling case law enumerating examples that meet the "common scheme" standard, instead relying on a different, unduly narrow description of the relevant factors for which she cites only one First Circuit case in support. (Mot. at 3). Of course, even by Luo's metric, her motion for severance fails. All of the victims were contacted by Luo using the same or similar *modus operandi*, in the same location (Manhattan), during the same time period (initiating contact in or about late 2022 through early 2023), and Luo's crimes against each victim all involved financial fraud.

Victim-3, Luo purported to quickly proclaim her love for each of them after just a few contacts in 2023, and proceeded to pressure each for money to varying degrees of escalation. For this reason alone, Counts One through Seven should be tried together. Luo primarily cites to *United States v. Tubol,* 191 F.3d 88 (2d Cir. 1999), a case where joinder was held to be improper where a defendant faced trial for robberies that "used distinctly different methods" and "targeted distinctly different victims." *Id.* at 96. Luo fails to note, however, that even *Tubol* maintained that joinder is proper where, as here, offenses each have a similar "*modus operandi*." *Id*. (citing several cases holding the same).[2]

Similarly, all Counts involve the same "alleged dishonesty." *Ruiz*, 894 F.2d at 505. First, Luo lied to each of her Victims regarding her purported interest in forming business connections. This key lie included at least two instances when she claimed to be soliciting "non-profit" funding when the evidence will show that she ultimately only intended to steal for her own personal use. Luo then escalated her dishonest tactics in order to extract even more from each of the Victims, including by demonstrating a persistent pattern of fraudulent behavior. That fraudulent behavior admittedly ran the gamut, from stealing Victim credit card information for several-thousand dollar purchases to fraudulently altering photographs and making extortionate threats in order to obtain in excess of $1 billion. But criminal conduct need not be identical in order for it to be properly joined in an indictment, and at bottom, Luo's repeated lies "all involved substantial alleged dishonesty" of a "similar" nature. *Epps*, 742 F. App'x 544, 547 (2d Cir. 2018).

---

[2] Luo relatedly appears to note that the Counts cannot be part of the same core conduct merely because she used the same method—"direct messaging them online"—to attract her victims. (Mot. at 4-5 (citing *United States v. Bezmalinovic,* 1996 U.S. Dist. LEXIS 18976 (S.D.N.Y. December 26, 1996))). But the Government is plainly not relying only on Luo's fraudulent use of LinkedIn to establish *modus operandi*. Instead, unlike the offenses in *Bezmalinovic*, and as explained above, several other factors here make Luo's crimes sufficiently similar in nature to permit joinder.

All counts in the Superseding Indictment are properly considered part of one core scheme for an additional reason: they all arise from Luo's ever-present motive, from at least 2022 through at least 2025, to unlawfully obtain money and property in order to fund her lavish lifestyle. And although Luo had Sexual Encounters with each of the three Victims at different times, the continuous occurrence of the Sexual Encounters through 2022 and 2023 further indicate that Luo possessed the same core financial motivation throughout this entire period (and indeed, this motivation makes sense given that Luo does not appear to have had any legitimate income at that time). Given this common motivation, "a reasonable person would easily recognize the common factual elements that permit joinder," *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003), and there is a "sufficient logical connection" between the counts to justify joining them, *Ruiz*, 894 F.2d at 505. *See also United States v. Saad*, 380 F. Supp. 2d 286, 288 (S.D.N.Y. 2005) (denying motion to sever counts because the two schemes were connected by a "common motivation"). Indeed, given her "common motivation," the Government will offer "overlapping" evidence to prove Luo's motive and intent with respect to all Counts of the Superseding Indictment. *Amato*, 15 F.3d 230, 236 (2d Cir. 1994). For example: with respect to both Counts One through Four and Five through Seven, the Government will seek to offer some of the same evidence from Luo's electronic devices, including "notes" to herself which shed light on her intent to use men to fund and facilitate her lavish lifestyle. Such notes include an entry from 2023 in which Luo assigned "bills and grocery money" to one man; another for "meals"; another for "rent"; another for "connections"; and another for "building a house." The Government will offer other evidence in which Luo discussed her scheme in private notes, including at least one entry from 2023 that mentions Victim-1 and Victim-2 together.

### 2. Evidence of the Conduct Underlying Counts Five Through Seven Would Be Admissible At Trial Even If The Counts Were Severed

The Counts are further properly joined because even at a trial only of Counts One through Four, proof of Luo's crimes against Victim-2 and Victim-3 would be admissible under Federal Rule of Evidence 404(b) as proof of motive, intent, preparation, plan, knowledge, absence of mistake, lack of accident, and a common scheme or plan. In addition to the "common scheme or plan" purpose, which is described above, the Government will also offer the evidence underlying Counts Five through Seven to prove Luo's willfulness, knowledge, and intent; elements that Luo has indicated she intends to dispute at trial. Indeed, in addition to noticing an advice of counsel defense, Luo specifically indicated in her motion to dismiss the Indictment that, due to her status as a "non-lawyer who speaks English as a second language," she was mistakenly persuaded to commit blackmail, wire fraud, and extortion by her then-lawyer. (Dkt. 38 at 8). But Luo's claim that her fraud on Victim-1 was a mistaken product of her general unsophistication is belied by her conduct with respect to Victim-2 and Victim-3, where she demonstrated a sustained capability and willingness to lie and deceive—including through the use of the same and similar tactics—for the same exact kind of financial gain she sought from Victim-1. Luo's demonstrated fraudulent campaign for financial gain also flatly contradicts a similar claim she appears intent on raising at trial: that her extortion of Victim-1 was motivated by her "overriding objective" to "seek justice." (*Id.* at 5).[3] The Government will therefore offer the same evidence that it would use to prove Counts Five through Seven as Rule 404(b) evidence to prove Counts One through Four. Because

---

[3] Indeed, this assertion appears premised on Luo's claim that Victim-1 wronged her as a result of the Sexual Encounter. Specifically, in demanding in excess of $1 billion, Luo falsely claimed that Victim-1 was her only sexual partner during a certain time period. But the testimony of Victim-2 and Victim-3—who were romantically involved with Luo in or about the same time period—will be offered to further demonstrate that Luo told lies about her sexual history for the sole purpose of extracting more money from Victim-1.

joinder is proper where the same evidence will support all of the joined counts, *see Blakney,* 941 F.2d at 116, joinder is proper here.

**3. Luo Cannot Demonstrate Substantial Prejudice from Joinder**

For similar reasons, Luo's argument for severance under Rule 14(a) should be rejected. Luo cannot demonstrate prejudice that would be "sufficiently severe to outweigh the judicial economy" of a joint trial, *Page*, 657 F.3d at 129, and because the proof is overlapping, any conceivable prejudice from a joint trial falls well short of being "unfair." *Id.* Indeed, the jury learning of Luo's credit card-related frauds on Victim-2 and Victim-3 will hardly result in a "miscarriage of justice" in the context of evidence of an extended fraud and extortion campaign whereby Luo attempted to obtain in excess of $1 billion by threatening harm to virtually every aspect of Victim-1's life. *Blakney*, 941 F.2d at 116. Furthermore, the supposedly prejudicial evidence would be admissible even at separate trials, which also supports joinder. *See United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (claim of prejudice is insupportable where supposedly prejudicial evidence would be admissible at separate trial); *see also United States v. Blaszczak*, 947 F.3d 19, 44 (2d Cir. 2019) (joinder of insider trading charges was proper and, in any event, harmless, where evidence about separate insider trading scheme would have been admissible in separate trial as relevant and "useful background" on the defendant's methods and sources), *vacated on other grounds by Blaszczak v. United States,* 141 S. Ct. 1040 (Jan. 11, 2021). Finally, as this Court is well aware, any potential prejudice could be cured by means less drastic than severance, such as appropriate limiting instructions. *See Zafiro*, 506 U.S. at 537-39 (explaining preference for joint trials to promote efficiency and that limiting instructions can often cure any prejudice); *United States v. Rivera*, 546 F.3d 245, 254 (2d Cir. 2008) (similar).

## IV. CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

Dated: New York, New York
October 2, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: ______________________________
Jackie Delligatti
Qais Ghafary
Assistant United States Attorneys
(212) 637-2559/-2534